## THE WILLOWDENE.

(District Court, E. D. Pennsylvania. September 14, 1899.)

Nos. 29, 30.

SHIPPING—LIBEL FOR BREACH OF CHARTER.

The master of a British vessel, under a time charter expiring April 26, 1898, by instruction of the owner, refused to load a cargo at Philadelphia for Matanzas, Cuba, on the ground that the voyage could not be made before the expiration of the charter. Before the vessel could have been loaded war was declared between the United States and Spain, the port of Matanzas was blockaded, and the vessel would not have been cleared for that port. *Held* that, inasmuch as no actual damage was sustained

by the charterer, a libel against the vessel for breach of the charter would not lie, and the ground on which the master's refusal to load was based became immaterial.

In Admiralty. These were suits in rem against the British steamship Willowdene for breach of charter.

Biddle & Ward and J. Rodman Paul, for libelants.

Convers & Kirlin and Henry R. Edmunds, for respondents.

McPHERSON, District Judge. The Willowdene is a British steamer, owned in Newcastle. On January 18, 1898, her New York agents chartered the vessel in that city to Daniel Bacon, under a contract whose terms need not be set out in detail. It is enough to say, in general, that the charter required the vessel to be delivered to Mr. Bacon at a port in the United States north of Hatteras, and that the term of hiring was three calendar months from the date of delivery. She was thus delivered upon January 26th, and thereupon began to carry cargo to and from the West Indies. Two voyages were made between January 26th and April 13th, and upon the last-mentioned date the vessel arrived at New York with an inward cargo of sugar. Upon the second outward voyage she had carried coal from Philadelphia to Matanzas and Havana under a subcharter to the American Export Coal Company, and upon March 16th a second subcharter to the coal company was made by Mr. Bacon, providing for the carriage of another cargo to Havana or Matanzas only, or to both ports, at the company's option. The master of the steamer learned of this second subcharter before he left Matanzas on the return voyage to New York, and no doubt communicated the fact to the owners in England. At all events, shortly after the ship had returned to New York, probably on April 14th or 15th, the owners cabled their New York agents that they would not allow another trip under the charter for less than £950 per month, this sum being an advance upon the rate of hiring originally agreed upon. It will perhaps explain the present dispute more clearly if the correspondence between the parties be quoted in some detail.

On April 15th, Bennett, Walsh & Co., the steamship's agents in New York, wrote the following letter to Mr. Bacon:

"April 15, '98.

"Daniel Bacon, Esq., New York—Dear Sir: We have to-day received the following cable from owner of Steamship Willowdene, reading: 'Willowdene expires within ten days. Owner will not allow another trip under £950 per month, present charter. What are you going to do about it?' We take this to mean that the owner wants £950 after expiration of present charter. Kindly let us have your opinion on this matter, so we may cable owners immediately, and oblige.

"Yours, truly, Bennett, Walsh & Co."

To this letter Mr. Bacon replied on the same day:

"New York, April 15, 1898.

"Messrs. Bennett, Walsh & Co., Agents, Br. S. S. Willowdene, City—Dear Sirs: Duly replying to your favor of even date, re charter of S. S. Willowdene, I have to say that the charter of this vessel expires on the 26th inst., at 9 a. m. You are quite aware that the question of when a charter terminates, under such circumstances, has been brought up several times, and it has invariably been decided that the time charterer has the right to dispatch a boat on any reasonable voyage, up to the time of expiration of the charter. I calculate to have the vessel leave Philadelphia on the 18th inst. for

a quick trip to Cuba and return, and when I fixed her for that voyage I considered that I had a perfect right to send the boat on such a trip as was necessary to fill out my original time on the boat. I must take exception to the owners' right to change the rate of hire money, under any circumstances. Either I have no right to send the boat at all, which contention I dispute flatly, and cannot entertain, or else the original rate of hire governs any overrun of the original charter.

"Yours, truly,                                                              Daniel Bacon."

## The agents responded as follows:

"April 15, 1898.

"Daniel Bacon, Esq.—Dear Sir:  As agents of the owner of the steamship Willowdene, and in behalf of owners, and in compliance with their instructions, we notify you that the charter party of this steamer expires April 26, and the owners protest against your sending the steamer to Philadelphia to-morrow to load coal for Cuba, as you cannot complete the voyage at that time, and they hold you liable to the extent of damages, and refuse to consent to a breach of charter unless rate is made £950 per month for the extra time over what the vessel is chartered for.

"Yours, truly,                                                    Bennett, Walsh & Co."

Upon April 16th, Mr. Bacon repeated the contention of his previous letter:

"April 16, 1898.

"Messrs. Bennett, Walsh & Co.—Dear Sirs:  Replying to your favor of yesterday, in which, on behalf of the owners of the S. S. Willowdene, you protest against my sending the vessel to Philadelphia to load coal for Cuba, I would say that it is absurd for the owners to contend that I have not this right, as the vessel is certainly under my charter, at least until the 26th inst.  You will, of course, acknowledge that on a low or falling market, were I to attempt to redeliver the ship one day before the expiration of the 3 months, that owners would, of course, refuse to accept my plea that time was almost up.  I can only further say that, if the owners in any way prejudice my interests, I will hold them, and the ship, strictly accountable for any damage which I sustain, and, of course, I expect to be responsible to the owners for any liability I may incur of any kind, under our present charter.

"Yours, truly,                                                              Daniel Bacon."

Upon the same day the master wrote the following letter to Mr. Bacon:

"Dear Sir:  Replying to your letter of the 15th inst., to my agents, I beg to advise that I am not informed of any case in which it has been decided that the time charterer has the right to dispatch a boat on a voyage on which she cannot be at least on the way back to her port of return delivery at the time of the expiration of the original term.  You have advised me by telephone to-day that you do not think the discharge of the ship will be completed before Monday, the 18th inst.  She could not, therefore, reach Philadelphia before the 19th, and, judging by my experience on the two previous voyages on which I have loaded coal under your charter, I could not leave Philadelphia before the 21st or 22d.  By leaving on the 21st or 22d, we would reach Matanzas about the 27th, as six days must be allowed for the passage.  On my previous voyages, it has taken 11 days to discharge a full cargo of about 3,100 tons in Havana, and 8 days to discharge 2,000 tons in Matanzas.  Basing the probable despatch for this voyage on the experience of the previous voyages, the discharge in Matanzas would not be finished before the 8th or 9th day of May, and, if the ship returned in ballast, she would probably reach New York about the 14th or 15th of May.  If we brought a return cargo of sugar, from seven to ten days would be used in the loading of it, at the rate of the previous voyage, which would retard our arrival here until about the 22d to 25th of May, or nearly a month beyond the period of your present charter.  On the last round voyage, you will recall that we sailed from New York on the 8th of March, and from Philadelphia on the 10th, and only arrived back in New York on the 13th of April.  If this length of time were consumed on another voyage, our return here, assuming

that we left on the 18th of April, would be about the 24th of May. My owners consider it would be unreasonable for you to detain the ship so long beyond April 26th, at 9 a. m., the date on which the charter party dated 18th of January, 1898, will expire. I am instructed, therefore, to decline to enter upon another voyage to Cuba under the existing contract.

"Yours, very truly, Wm. Anderson, Master."

Meanwhile the cargo was being discharged, and, in anticipation of the completion of this work, Mr. Bacon gave the master of the vessel the following instructions on Friday, April 15th:

"April 15, 1898.

"Capt. Anderson, S. S. Willowdene—Dear Sir: I expect to get the Willowdene under way for Philadelphia, Monday, and you should therefore be up to Philadelphia, and alongside of the coal wharf, if possible, by Wednesday morning early. The vessel will load at Greenwich, as before. If the Willowdene gets a fair start Wednesday morning, shippers expect to finish her loading in time for her to sail Wednesday. Considering the possibility of trouble between the governments of Spain and the United States, before your ship can get away from Cuba, I wish to lay out the following plans, in the event of communication being cut off between myself and you after you have left Philadelphia: First, as to collection of freight: As before, we cannot, of course, demand payment of freight until after the ship finishes discharging, under ordinary circumstances; but if there is any way of getting it, or any part of it, in advance, I will trust you to take the necessary steps. If upon the vessel's discharge, should war have broken out previously, the only way to do, I suppose, is to try and get the cash in hand, and keep it on board the ship until you return. I will write Messrs. D'Costa on the subject, so that they will work with you. Then, should the ship be unfixed for homeward cargo, after trouble had commenced, I will leave the chartering in the hands of yourself and Messrs. D'Costa. The last rate paid on sugar was 13 cents per 100 pounds; 10 cents per 100 pounds would give me a small profit on the ship. Of course, you would do the best you could as regards getting a good freight. If it should be impossible to get any homeward cargo, you will, of course, get clear of Cuba as soon as possible, and I would suggest your touching at the nearest port, say Key West, for orders, wiring me your arrival immediately. With nothing further to mention, I am,

"Yours, truly, Daniel Bacon.

"Please mail or deliver letters herewith upon arrival in Matanzas."

The dispute having reached this stage, counsel were consulted by both parties,—indeed, the consultation may have been somewhat earlier, but the precise date is not important,—and the probability of an appeal to the courts became evident. Counsel for the vessel prepared to enter security in case a libel should be filed, and agreed that she should not leave New York until security was given. On April 18th, the following letters were exchanged:

"Apl. 18, '98.

"Daniel Bacon, Esq.—Dear Sir: S. S. Willowdene: I have cabled my owners in pursuance with my letter to you of the 16th, and, although the boat is chartered until the 26th, they are willing (so you do not pay dead hire) to take the boat as soon as she has finished discharging her cargo. But, as I notified you on the 16th, they will not allow the boat to proceed on another voyage to Cuba, as it would be in violation of charter party, for reasons stated. The charter party expires on the 26th; to-day is the 18th, which leaves but eight days between to-day and the expiration of present charter to proceed to Philadelphia and load for Cuba; and, practically speaking, the charter party would be about finished before I left the United States.

"Yours, truly, Wm. Anderson, Master."

"April 18, 1898.

"Capt. Anderson, Br. S. S. Willowdene—Dear Sir: Replying to your various favors re withdrawal of your vessel from my time charter, please note that I

cannot allow any of your contentions. Kindly repair to this office promptly, to enable me to clear your vessel for Philadelphia. She will be discharged this evening, and I want to get her off to sea. If you violate our charter in any way, such as withdrawing the ship, I will sustain damages, and the ship will also be liable for any damage sustained by the subcharterers (the shippers of her coal cargo), and I must here reiterate that ship and owners will be held strictly accountable for all losses to me of any kind whatsoever.

"Yours, truly,            Daniel Bacon."

"April 18, 1898.

"Capt. Anderson, Br. S. S. Willowdene—Dear Sir: As you have declined to clear the ship for Philadelphia this afternoon, as requested by me, I beg to advise you that, should any loss of time result through this refusal, I shall hold the ship responsible, and deduct the time lost.

"Yours, truly,            Daniel Bacon."

"April 18, 1898.

"Daniel Bacon, Esq., Messrs. Alexander & Ash, 1 Broadway, New York—Dear Sirs: S. S. Willowdene. We have just been informed by Messrs. Alexander & Ash that they propose to file a libel forthwith against this vessel, and stating that the master has to-day refused to go to Philadelphia under the pending charter party. This is to inform you that no such refusal has been made, and that the captain is now and has at all times been ready to proceed in due course to Philadelphia or to any other port within the proper terms of the charter party. He has been in consultation with us on this subject, with the understanding that we were to furnish security to a libel that would be filed by your proctor, Mr. Macklin, for a refusal of the vessel to proceed to Cuba, and there never has been any issue between us with respect to her proceeding to Philadelphia. We are prepared to furnish you security to a libel demanding that the ship shall proceed on the voyage to Cuba heretofore contemplated by you, and the only reason the vessel has not cleared to-day is that it was understood that proper security must first be given, before she would be permitted to leave this port, and it has been in satisfaction of this understanding that she has remained. Under these circumstances, the master is quite willing and hereby tenders his ship for a voyage from here to Philadelphia, and will clear and proceed for that port at the earliest opportunity, upon your instructions and waiver of the requirements for security before departure, which has heretofore been the understanding between the attorneys for the respective sides. You will take notice that Mr. Bacon's letter of this date was not received by the master until it was too late to have cleared, as, although the custom house remained open until 4 o'clock, the British consul's office closed at 3 p. m., to which fact the master directed the attention of Mr. Stoddard on his conversation with him after 3 p. m. to-day.

"Yours, very truly,     Convers & Kirlin, Proctors for Willowdene."

## To the last letter Mr. Bacon replied on April 19th:

"Messrs. Convers & Kirlin, S. S. Willowdene—Dear Sirs: I have duly to acknowledge the receipt of your valued favor of the 18th inst., directed to myself and my attorneys, and the contents of same have my most careful attention. In regard to your various little legal excuses regarding the clearing of the ship, allow me to say that I had no use for them whatever, and, in fact, do not take them seriously. The real state of the case, in my opinion, is as follows: The owners of the vessel, on account of the increased value of time-chartered boats, are trying to extort an additional £100 hire from me, in a case in which they must know well they are morally and technically in the wrong, and I was surprised at your entertaining the case. I presume I have been selected as the party to which a test case is to be applied, and I, on my part, shall use my best efforts to make the owners of the vessel pay for their unwarrantable interference. Probably you do not intend to make mis-statements, but I am quite ready to produce my witnesses to show that the captain did actually decline yesterday, and, furthermore, would state that on Saturday he understood fully that he was to clear on Monday morning, and would have done so had owners attended to their own business. The ship is now cleared, and ready to sail for Philadelphia, and will load there and sail

according to my charter party, unless I learn meanwhile of some better reason for her not so doing than has, as yet, been presented to me.

"Yours, truly, Daniel Bacon."

There has been some controversy concerning the delay of the vessel in leaving New York. I do not think that such delay as may have occurred should have any influence in the decision, but, in any case, I see no fault in the vessel. Her cargo was not discharged until 5 o'clock in the afternoon of the 18th. She did not receive her papers from the British consul until 10 or 11 o'clock in the morning of the 19th, and she sailed between 2 and 3 o'clock on the same day. She reached Philadelphia about half past 7 on the morning of the 21st, and, in obedience to the instructions of Mr. Bacon's agents in that city, proceeded to pier 4, at Greenwich. Thereupon the master addressed the following inquiry to the agents, and also to the American Export Coal Company:

"Gentlemen: In view of the fact that the charter party between the steamer and Daniel Bacon will expire by limitation at 9 a. m. on the 26th of April, I desire to know before taking any cargo on board what it is destined for. Yours, very truly, Wm. Anderson, Master."

To this letter of the master these replies were sent upon the same day:

"International Coal-Mining Co.

"Philadelphia, April 21, 1898.

"Mr. William Anderson, Master Steamer Willowdene, Phila.—Dear Sir: Replying to your favor of date, the coal to be loaded into the steamer Willowdene is destined for Matanzas, Cuba.

"Respectfully yours, Henry W. Lambirth, President."

"Philadelphia, April 21, 1898.

"Captain Anderson, Br. S. S. Willowdene—Dear Sir: In reply to your communication of even date, we would state that the time charterer, Daniel Bacon, of New York, has given us instructions to have your vessel load a full cargo of coal, which is ready and waiting, and that we are to clear the vessel for Matanzas, Cuba. We hand you herewith copy of charter under which said cargo is to be loaded, and insist upon your commencing to load at once, or your steamer will be held liable for all losses, damages, etc., arising from your refusal to carry out contract.

"Yours, truly, I. Westergaard & Co., Agents for Daniel Bacon."

Whereupon the master rejoined to the agents and the company as follows:

"Philadelphia, 21 April, 1898.

"Gentlemen: Having received notice from you that the cargo ordered to be laden on board my steamer is bound for a port in Cuba, I beg leave to refer to my letter of April 16th, to Mr. Daniel Bacon, the charterer of this steamer, and to inform you that I decline to load any cargo of coal for a port in Cuba, upon the grounds stated in that letter.

"Yours, very truly, Wm. Anderson, Master."

The coal company answered, insisting that the vessel should proceed to load:

"New York, April 21, 1898.

"Captain S. S. Willowdene, Mr. Wm. Anderson, Philadelphia—Dear Sir: We beg leave to advise you that we shall hold your steamship and owners liable for any damage incurred because of noncompliance with the conditions of contract entered into between the American Export Coal Co. and Mr. Daniel Bacon, the chartered owner of your steamer, and we shall take such steps as are necessary to enforce our rights. You will please proceed to load at once, as the coal is standing at the piers.

"Yours, truly, American Export Coal Company,

"Henry W. Lambirth, Vice President."

This closed the correspondence, except that Mr. Bacon telegraphed to his agents during the day, inquiring whether the master objected to all West India ports, or only to Cuba, and in reply to the inquiry the master wrote the following letter:

"S. S. Willowdene, Philadelphia, 21 April, 1898.

"Messrs. I. Westergaard & Co.—Gentlemen: Referring to telegram read to me by Mr. Butler inquiring whether I object only to Cuba or to all West India ports, I beg leave to say that if you will notify me which port you wish to send the ship to in West Indies I will then give you a reply.

"I remain, gentlemen, yours, respectfully,

"Wm. Anderson, Master."

No answer was given to this communication, and nothing further seems to have passed between the parties. On April 22d, Mr. Bacon attached the vessel, and on April 23d the coal company took similar proceedings. The marshal's custody continued until noon of April 26th, when security was entered, and the ship was released.

The libelants' position is clearly indicated by the foregoing correspondence. In brief, it may be stated thus: Under a time charter, the vessel may be sent upon a voyage to any port permitted by the contract, at any date before the expiration of the charter, although it is certain that the voyage cannot be finished until after the charter expires; or, at least, she may be sent upon a voyage to the same ports at which she has been previously trading under the charter, or upon a voyage not longer than those which she has previously completed, although it is certain that the voyage cannot be finished until after the charter expires. The claimant disputes this position, and contends that under such a charter the vessel cannot be sent upon a voyage from which it is certain she cannot return until after the term of hiring has expired. The question is important, and not easy to answer. It is rendered more difficult in the present case, because the charter now before the court contains conflicting provisions, which no construction can fully harmonize. There is a question also concerning the existence of a custom in the port of New York, that may affect the rights of the parties under a time charter; and a third question concerning the right of the coal company to file a libel in rem, no cargo having been received under the subcharter. But I pass these questions without deciding them. They may arise hereafter before the circuit court of appeals, but it seems to me to be useless for the district court to consider and decide them, if I am right in believing that both libels must be dismissed for a reason that is alone sufficient.

This reason is the breaking out of war between Spain and the United States on April 21st, followed immediately by the blockading of the ports of Havana and Matanzas, whereby it became impossible to undertake the voyage upon which the libelants were insisting. The facts are well known. On April 20th, congress passed a resolution demanding that Spain should at once relinquish its authority and government in the island of Cuba, and withdraw its land and naval forces therefrom; and the president was directed and empowered to use the entire land and naval forces of the United States, including the militia of the several states, to carry the demand into effect. This resolution was communicated to the Spanish government on the same day, and diplomatic relations between the two countries were

immediately broken off. This breach was recognized by both nations as a state of war, and accordingly when congress, on April 25th, made the formal declaration, the statute announced "that war has existed since the 21st day of April, A. D. 1898, including said day." On April 22d, the president proclaimed a blockade of the north coast of Cuba, between Cardenas and Bahia Honda, thus including Havana and Matanzas; and the blockade was at once made effective, and continued for several months. The collector of the port of Philadelphia would have refused to clear the Willowdene for Havana or Matanzas on April 21st, if a clearance had been applied for on that day, and of course there would have been a similar refusal afterwards, as long as the blockade remained in force. These facts, I think, fall within the clause of the charter concerning "restraint of princes, rulers, and people," and excused the ship from undertaking the voyage in controversy. By the declaration of war, it became unlawful for an American citizen, whether an individual or a corporation, to trade with the enemy, even in a neutral ship; and, even if the trade had been lawful, the charter could no longer be carried out, because the ship could not enter the blockaded ports. There was no alternative order to go elsewhere. The master was directed to sail for Cuba,—a particular port of that island being specified,—and when he declined to undertake such a voyage no further instructions were given.

I do not understand the libelants to deny the general propositions just stated. Their answer is that this defense cannot now be taken, because the master's refusal to go to Cuba was put distinctly upon a different ground, and to this ground they insist that the ship must now be confined. The answer might be sound enough in many cases, but I do not think it is sufficient in the present controversy. Assuming that the contract between the parties was broken by the refusal of the master to sail for Cuba, upon what theory are the libelants to recover damages? Manifestly, upon the theory that the voyage could have been made, save for the master's wrongful conduct, and therefore that the charterers have been deprived of the profits that would otherwise have come into their pockets. But this theory breaks down entirely in the face of the facts. Even if the captain had agreed to go, the voyage could not have been made, and, of course, no profit would have accrued therefrom to either charterer. To allow a recovery of profits that could never have been realized, merely because the master put his refusal upon one ground rather than upon another, seems to me impossible. In the situation now before the court, it is the fact of refusal that is important, and not the master's reason therefor. When he refused, a state of war existed, and the contemplated voyage was unlawful, the charterers being American citizens; and, before the cargo could have been taken on board, the unlawful voyage had also become impossible, an effective blockade having been established. The refusal had abundant support, therefore, and I see no legal or equitable reason to estop the ship from setting up now the complete justification that actually existed, although another ground for the refusal was then relied on. The libelants were not injured in any degree by the master's ignorance that war existed, and by his consequent silence upon this point.

In each case the libel will be dismissed, with costs.